**Kathleen STONEKING, Plaintiff,**

**v.**

**BRADFORD AREA SCHOOL DISTRICT, Frederick Smith, in his individual and official capacity as principal of Bradford Area High School; Richard Miller, in his individual and official capacity as assistant principal of the Bradford Area High School and Frederick Shuey in his individual and official capacity as Superintendent of the Bradford Area School District, Defendants.**

**Civ. A. No. 87–63 Erie.**

United States District Court, W.D. Pennsylvania.

Aug. 28, 1987.

Deborah W. Babcox, Pecora Duke & Babcox, Bradford, Pa., for plaintiff.

Kenneth D. Chestek, James D. McDonald, Jr., Erie, Pa., for defendants.

## OPINION

MENCER, District Judge.

## I. INTRODUCTION

On March 24, 1987, Kathleen Stoneking filed a civil rights action against Bradford Area School District ("School District"), Frederick Smith, the Principal of the Bradford Area High School, Richard Miller, the Assistant Principal of the Bradford Area High School and Frederick Shuey, the Superintendent of the School District.[1] The

---

1. Pursuant to an order entered May 22, 1987, this case was consolidated for trial with similar actions filed on behalf of Kim Harbaugh and Lisa Rovito. Motions for summary judgment were filed in the Harbaugh and Rovito cases on April 13, 1987. At that time, the parties provided the court with extensive briefs and voluminous deposition testimony. The motions, briefs and deposition transcripts from the Harbaugh and Rovito cases have been adopted for the

gravamen of the complaint is that the defendants violated the constitutional rights of the plaintiff by failing to remedy the situation that existed at the Bradford Area High School. According to the allegations in the complaint, the individual defendants knew or recklessly failed to discover that Edward Wright, the band director at the High School, was sexually assaulting female members of the band. Additionally, it is alleged that the School District had a practice or custom of failing to appropriately respond to complaints by female students of sexual abuse or harassment perpetrated by male teachers.

The defendants have filed a motion for summary judgment. As set forth in their brief, the first ground for the motion is that the plaintiff failed to file her complaint in a timely fashion. The defendants also assert that the plaintiff failed to identify a constitutional right which has been violated. The defendants contend that as a matter of law there is no § 1983 claim because there is no individual liability nor is there any policy, practice or custom which would implicate the School District. In the alternative, it is asserted that defendants Smith, Miller and Shuey are entitled to qualified immunity. Finally, the defendants assert that the complaint fails to set forth state law violations.

After consideration of the briefs, the voluminous deposition testimony and the relevant case law, this Court concludes that: (1) there are genuine issues of material fact pertaining to the statute of limitations; (2) the plaintiff has alleged a violation of a well-established constitutional right; (3) there are genuine issues of material fact pertaining to the liability of defendants Smith, Miller and Shuey; (4) there are genuine issues of material fact regarding the existence of an "official practice or custom;" (5) defendants Smith, Miller and Shuey are not shielded from liability by the

purposes of the pending summary judgment motion. Reliance on those briefs will simply be noted by reference to the "Companion Case."

**2.** The final count in the complaint was mislabeled "Count V." It should, however, be Count VII.

defense of qualified immunity and (6) the complaint does fail to set forth state law claims. Therefore, this Court shall deny the motion for summary judgment filed on behalf of the defendants, as it pertains to Counts I, III, V and VII[2], and grant the motion as it pertains to Counts II, IV and VI.

## II. FACTUAL BACKGROUND

In August, 1975, Edward Wright was hired by the Bradford Area School District to serve in the capacity of band director. Mr. Wright was responsible for instructing band activities and providing students with music lessons. Under Mr. Wright's direction, the high school band and individual band members were extremely successful in both regional and remote competitions. The band came to be the pride and joy of the school and the community. As the band's acclaim grew, so too did the acclaim of Edward Wright.

Three and a half years into Mr. Wright's tenure, a young woman by the name of Judy Grove[3] came forward and informed Dr. Smith, the School Principal and Mr. Miller, the Assistant Principal, that the band director had sexually assaulted her. At that time, Ms. Grove openly acknowledged that she had been drinking prior to the assault and that the assault had taken place at Mr. Wright's residence. The details of the events that followed Ms. Grove's disclosure are vigorously contested. All parties agree, however, that Dr. Smith ultimately appeared before the band to quiet the "rumors" and to encourage the band to work together again.

Mr. Wright's sexual abuse and harassment of Kathleen Stoneking began in the fall of 1980. The first incident of abuse consisted of Mr. Wright forcibly kissing Ms. Stoneking. As time progressed, the abuse greatly accelerated both in terms of frequency and in terms of intrusiveness.

**3.** Since graduating from high school Judy has gotten married and her legal name is Judy Grove Sowers. For the purposes of this opinion, however, the Court will use the witness's maiden name.

The sexual abuse continued, on an almost weekly basis, until Ms. Stoneking graduated from high school in the spring of 1983. As reported by the plaintiff, there were isolated incidences of abuse that occurred as late as May, 1985.

In early March, 1986 William Smith, Frederick Smith's son, informed his father that Mr. Wright was sexually assaulting female band members. Almost immediately after this information was conveyed to Dr. Smith, the School District responded. The parents of other students who had been assaulted were contacted. Several meetings followed which were attended by various administration officials, the parents of some of the girls who had been assaulted and the girls themselves. Mr. Wright was suspended as of March 10, 1986 and later resigned from his job. Subsequently, Edward Wright pled guilty to a ten count indictment.[4]

## III. STANDARD FOR SUMMARY JUDGMENT

In reviewing a motion for summary judgment, the Court is governed by the standard set forth in Fed.R.Civ.P. 56(c). In pertinent part the Rule provides "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part is entitled to judgment as a matter of law."

The application of this standard requires that "[i]nferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion." *Baker v. Lukens Steel Co.*, 793 F.2d 509, 511 (3d

Cir.1986), *citing, Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Therefore, this Court must resolve all doubt, as to the existence of a genuine issue of material fact, in favor of the plaintiff.

## IV. LEGAL DISCUSSION

### A. Statute of Limitations

■ In its recent decision of *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the Supreme Court declared that all actions brought pursuant to 42 U.S.C. § 1983 shall be characterized as personal injury actions and are subject, therefore, to the applicable state statute of limitations. In reaching this conclusion the Court instructed that: "[t]he characterization of § 1983 for statute of limitations purposes is derived from the elements of the cause of action, and Congress' purpose in providing it. These, of course are matters of federal law.... [However,] the length of the limitations period, and closely related questions of tolling and application, are to be governed by state law." *Id.* at 268–69. Therefore, for claims arising in Pennsylvania, federal courts must apply the two year statute of limitations set forth in 42 Pa.C.S.A. § 5524(2). *See Sullivan v. City of Pittsburgh*, 811 F.2d 171, 180 (3d Cir.1987); *Smith v. City of Pittsburgh*, 764 F.2d 188, 194 (3d Cir.), *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). Additionally, federal courts are bound to apply state tolling rules.

The well-established rule, regarding the tolling of the statute of limitations, is that the statute begins to run when the liability-creating act is committed. *See Bernath v. LeFever*, 325 Pa. 43, 47, 189 A. 342, 344

---

**4.** On a number of occasions, the defendants raised the issue of "consent." Accordingly, during the course of the depositions the girls who had been assaulted by Mr. Wright were quizzed on why they failed to "kick, slap, bite, hit, or knee" their teacher, Mr. Wright.

On November 6, 1986, Edward Wright plead guilty to criminal charges, including four counts of indecent assault. One of the elements of indecent assault is *lack of consent*. *See* 18 Pa. C.S.A. § 3126. By pleading guilty to the crimi-

nal charges Mr. Wright admitted that his victims had not consented.

The fact that Kathleen Stoneking choose not to immediately report the criminal acts of Edward Wright is, for the purpose of this proceeding, irrelevant. *Cf. Meritor Savings Bank v. Vinson*, — U.S. —, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (The Court held that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome'" *Id.*, 106 S.Ct. at 2406).

(1937) ("there is no evidence in the present record ... which, from whatever angel viewed, would justify a postponement of the operation of the statute beyond the time 'when the injury was done.'"). In order to prevent the harsh results that would occur if that rule were applied in all situations, the courts have created an exception. This exception is known as the discovery rule. *See Lewey v. H.C. Frick Coke Co.*, 166 Pa. 536, 547, 31 A. 261, 263 (1895).

The Pennsylvania Superior Court discussed applicability of the discovery rule in *Anthony v. Koppers Co.*, 284 Pa.Super. 81, 425 A.2d 428 (1980), *rev'd on other grds.* 496 Pa. 119, 436 A.2d 181 (1981). In that case, the court explained that, "the discovery rule is a judicial creation, fashioned to solve a specific problem, namely, whether the law should preclude recovery for an injury that not even a diligent party may reasonably be expected to discover." *Anthony*, 284 Pa.Super. 89, 425 A.2d at 432. The court went on to note that although the exception, as it was first applied involved the concealment of injury, "as the rule has developed it has become clear that its basis is not concealment by the defendant but rather the ability of the plaintiff to discover ... [her] injury *or its cause.*" *Anthony*, 284 Pa.Super. at 95, 425 A.2d at 436 (emphasis added). Thus, when the discovery rule is applicable the statute of limi-

tations will not start to run until the plaintiff actually discovers the injury and the cause of the injury or reasonably should have discovered such.[5]

The role of the court in evaluating a plaintiff's assertion that the discovery rule should apply is limited.[6] The court must decide whether there is sufficient evidence by which a jury could reasonably decide that the plaintiff did not discover the injury or its cause until after the occurrence of the liability-creating act. Once a court makes that determination the remaining questions are for the jury. As the court in *Burnside v. Abbot Laboratories*, 351 Pa. Super. 264, 292, 505 A.2d 973, 988 (1985), recently pointed out: "[W]here the issue involves a factual determination regarding what is a reasonable period of time for a plaintiff to discover ... [her] injury and its cause the determination is for the jury." *See also Taylor v. Tukanowicz*, 290 Pa.Super. 581, 586, 435 A.2d 181, 183 (1981).

In the instant action the plaintiff asserts that she did not discover that the individual defendants were the cause of her injuries until the School District took affirmative action to discipline and discharge Edward Wright.[7] Those events occurred in March, 1986. Thus, plaintiff contends that the two year statute of limitations should run from that date. Defendants, on the other hand,

---

5. Although the Pennsylvania Superior Court modified the discovery rule in *Cathcart v. Keen Industrial Insulation*, 324 Pa.Super. 123, 471 A.2d 493 (1984), that modification does not impact on the instant action. The court in *Cathcart* concluded that "an allegation of mere difficulty in identifying defendants ... [is] not sufficient to toll the running of the statute of limitations." 324 Pa.Super. at 139, 471 A.2d at 501. Significantly, the court expressly decided not to overrule, *Grubb v. Albert Einstein Medical Center*, 255 Pa.Super. 381, 387 A.2d 480 (1978), an earlier case where the statute of limitations was tolled because the plaintiff had been unable to determine the causal relation between her injuries and the manufacturer of a medical instrument that allegedly caused her injuries. This Court concludes that the factual situation in the instant action is more akin to *Grubb*, than *Cathcart*.

6. In evaluating an assertion that a claim is time barred, it is essential to keep in mind which party bears the applicable burden. Since the

statute of limitations defense is an affirmative one, *see* Fed.R.Civ.P. 8(c), the defendant bears the initial burden. If the plaintiff's response to this defense is that the statute of limitations should not run from the time the tortious act was committed, but rather from a later date when the plaintiff discovered the injury and its cause, i.e., if the plaintiff is relying on the discovery rule, then the burden shifts to the plaintiff. *Van Buskirk v. Carey Canadian Mines, Ltd,* 760 F.2d 481, 487 (3d Cir.1985). The plaintiff must allege and thereafter prove that she did not have knowledge of her injury or the cause of that injury until some date after the liability creating act occurred. *Id.* Additionally, the plaintiff must prove that she was diligent in her efforts to discover the injury or the cause in a reasonable period of time. *Bickell v. Stein,* 291 Pa.Super. 145, 150, 435 A.2d 610, 612 (1981).

7. Technically, Mr. Wright was given an option to resign. Although he later exercised that option, it appears as though he had little choice in the matter.

insist that plaintiff was aware of the requisite facts at least by the time she graduated from Bradford Area High School, in June, 1983.[8]

In addressing the court's role in determining whether a claim is time barred, the third circuit offered the advice that "[s]ince the applicability of the statute of limitations usually involves question of fact for the jury, defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." *Van Buskirk v. Carey Canadian Mines, LTD,* 760 F.2d 481, 498 (3d Cir.1985). Reviewing the available evidence in the light most favorable to the plaintiff, this Court concludes that the defendants have not satisfied that heavy burden. There are genuine issues of material fact pertaining to the tolling of the statute of limitations. Therefore, the motion for summary judgment, as it pertains to the statute of limitations defense, is denied.

### B. Evaluation of Section 1983 Claim

#### 1. Identification of constitutional right

In pertinent part 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom or usage of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The crux of any section 1983 action is a violation of a protected constitutional right. Thus, identification of the specific right is

"not a mere academic exercise and is necessary in determining whether a cause of action may be maintained under section 1983." *Metcalf v. Long,* 615 F.Supp. 1108, 1113 (D.C.Del.1985). *See also Fox v. Curtis,* 712 F.2d 84, 87 (4th Cir.1983).

■ In the complaint, plaintiff alleges that the defendants, acting under color of state law, deprived her of her rights, privileges and immunities as secured by the Constitution. More specifically, the plaintiff alleges that she was deprived of her liberty interest which entitled her to be free from the constant threats, intimidation, sexual abuse and sexual harassment perpetrated by Edward Wright. Although the plaintiff does not expressly link her claim to the substantive due process clause of the fourteenth amendment, identification of the liberty interest serves that purpose. The critical question is whether such a right is cognizable under the fourteenth amendment.

In discussing the breadth of the fourteenth amendment the district court in *Metcalf* pointed out:

> Substantive due process is a nebulous term, the meaning of which readily changes depending on the context of the particular situation. Substantive due process derives from the idea that the framers of the Constitution intended to protect rights other than those specified. In deciding that certain rights not specified in the constitution are protected by the due process clause, the Court has looked to those rights which are "so rooted in the traditions and conscience of our people as to be ranked as fundamental."

*Metcalf,* 615 F.Supp. at 1120. A review of the case law will assist in the task of determining whether the rights asserted by the plaintiff are so rooted in tradition and

---

**8.** The defendants' opposition to the application of the discovery rule is somewhat tenuous. In order to have the requisite knowledge which would preclude the application of the discovery rule, prior to the running of the limitation period Ms. Stoneking would have had to have *known* that Judy Grove was in fact sexually assaulted by Edward Wright. Ms. Stoneking would have had to have *known* that the defendants received notice of the assault. Additional-

ly, the plaintiff would have had to have known that the defendants knew that Judy's allegations were true and that in light of that information they choose to disregard Judy's complaint. Thus, in order to be precluded from the application of the discovery rule, the plaintiff would have had to have *known* that certain events occurred, events that the defendants vigorously contend never did occur.

conscience to rise to the ranks of fundamental.

The Supreme Court's decision in *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) is instructive in this area. The issue in *Ingraham* revolved around the use of corporal punishment in public schools. After deciding that the eighth amendment offered the school students no protection, the Court turned its attention to the fourteenth amendment due process clause.

In a summary fashion, the Court concluded that "where school authorities, acting under color of state law, deliberately decide to punish a child for misconduct by restraining the child and inflicting appreciable physical pain, we hold that Fourteenth Amendment liberty interests are implicated." *Ingraham,* 430 U.S. at 674, 97 S.Ct. at 1414. Thus, the Supreme Court recognized the existence of a substantive right to be free from bodily abuse.

Admittedly, the liberty interests asserted in the instant action are not identical to those asserted and recognized by the Supreme Court in *Ingraham.* However, common sense suggests that the right to be free from sexual abuse is at least as fundamental as the right to be free from the less intrusive physical abuse of paddling. The Supreme Court's view that corporal punishment implicates a constitutional liberty interest is persuasive evidence that allegations of sexual abuse and sexual harassment would raise to the same level.

*Ingraham* does not stand alone in this area; there are other cases that recognize a similar constitutional right. In *Doe v. New York City Department of Social Services,* 649 F.2d 134 (2d Cir.1981) (*Doe I*), the issue was whether a state agency could be liable for failing to protect a child from the physical and sexual abuse inflicted by the child's foster father. The court did not identify the specific constitutional right that formed the basis for the § 1983 action, but it did devote significant discussion to

the liability issue. It must be noted that in the absence of a constitutional violation there would be no need to consider liability. Thus, by inference alone, it can be concluded that the court in *Doe I* found that there existed a constitutional right to be free from physical and sexual abuse. *See also Doe v. New York City Department of Social Services,* 709 F.2d 782 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983) (*Doe II*).[9]

This Court also finds *P.L.C. v. Housing Authority of the County of Warren,* 588 F.Supp. 961 (W.D.Pa.1984) and *Doe "A" v. Special School District of St. Louis County,* 637 F.Supp. 1138 (E.D.Mo.1986) to be persuasive. The plaintiff in *P.L.C.* brought a § 1983 action against the Authority after she was raped by the defendant's employee who entered her apartment with a key provided by the Housing Authority. In a summary fashion, Judge Weber noted that "plaintiff's right to be free from such bodily injury and harm is a right of constitutional magnitude." *P.L.C.,* 588 F.Supp. at 962.

The district court in *Doe "A"* reached a similar conclusion. That case was instituted by nine handicapped children who were physically beaten and sexually abused by the individual who drove them back and forth to school. The court's discussion, regarding the existence of a constitutional right, is insightful.

The acts of abuse alleged by plaintiffs state a substantive due process claim. The acts intrude upon the personal privacy and bodily integrity of these children. The acts intrude in ways more personal and private than a jailhouse beating and in ways which will surely leave psychological scars long after physical healing is complete. Moreover, these acts are keenly distressing given the helplessness and blamelessness of the victims.... The alleged acts of defendant Cerny [busdriver] and the alleged tolerance of these acts by SSD [the School District] and the individual defendants pass be-

---

**9.** In an opinion written by Judge Sloviter, sitting by designation on the Second Circuit, the court reversed the granting of a judgment notwithstanding the verdict. Accordingly, the court held that the evidence was sufficient for a jury to conclude that the state agency acted with deliberate indifference in regard to the plaintiff's physical safety.

yond the pale of common law torts. They shock the conscience of this Court. *Doe "A"*, 637 F.Supp. at 1145. Although this Court is not bound by the holding in *Doe "A"* it deliberately adopts that court's well-reasoned rationale and conclusion.[10]

Therefore, this Court holds that the constitutional right, to be free from state intrusions into the realm of personal privacy and bodily security, in the ways alleged in the complaint, is well-established in law. The acts of sexual abuse, sexual harassment and intimidation inflicted by Edward Wright on Kathleen Stoneking, literally shocks the conscience of this Court. As evidenced by the case law, abuse of this type is not tolerated when the victim is a prison inmate or a patient in a state hospital. *See, e.g., Withers v. Levine*, 615 F.2d 158 (4th Cir.), *cert. denied*, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980)[11]; *Spence v. Staras*, 507 F.2d 554 (7th Cir. 1974).[12] Clearly then, the constitution must offer school children similar protection. Thus, the Court unequivocally rejects the defendants' assertion that the facts of this case fail to support a violation of a constitutional right.

## 2. Color of State Law

### a. Individual defendants

The next step in the evaluation of the plaintiff's section 1983 claim is determining whether the individual defendants owed a specific duty to the plaintiff. It must then be determined whether there is evidence of a breach of that duty.

### i. Defendants' duty

■ The resolution of the first part of this issue is complicated by the fact that neither Defendant Smith, Defendant Miller nor Defendant Shuey committed the abusive acts that are alleged in the complaint. Therefore, in order to establish the requisite duty, the plaintiff must show the existence of a "special relationship" between the individual defendants and herself.[13]

10. Additional support for this conclusion can be adduced from *Estate of Bailey by Oare v. County of York*, 768 F.2d 503 (3d Cir.1985). That case was brought by a father, on behalf of himself and his deceased child, after the brutal abuse inflicted on his daughter resulted in her untimely death. In reviewing the district court's Fed. R.Civ.P. 12(b)(6) dismissal, the appellate court noted: "Significantly, the court did not hold that Aleta or her father did not have a cognizable constitutional right. *There is a liberty interest in being free from physical assault* that can be fairly attributed to the action of a state." *Id.* at 509 n. 7 (emphasis added).

This Court does not view the physical abuse that rose to a constitutional right in *Estate of Bailey*, to be qualitatively different from the infliction of sexual abuse and harassment experienced by the plaintiff in the instant action.

11. The issue in *Withers* was whether the plaintiff had an eighth amendment right to be free from abuse inflicted by fellow prisoners. Accordingly, the court held: "A prisoner has a constitutional right 'to be reasonably protected from the constant threat of violence and sexual assault from his fellow inmates.'" *Withers*, 615 F.2d at 161.

12. The action in *Spence* was brought on behalf of a son who had been beaten to death by fellow patients in a state mental hospital. The plaintiff alleged that the defendants recklessly ignored the twenty odd beatings that had previously occurred. In reviewing a dismissal of the action, the appellate court held that, "[a]ssuming, as we must on a motion to dismiss, that the plaintiff can prove these allegations, the defendants' inaction was of sufficient magnitude to constitute a deprivation of rights under § 1983." *Spence*, 507 F.2d at 557

13. In support of their position that there is no special relationship between themselves and the plaintiff, the defendants point out that a teacher is not considered a "person responsible for the child's welfare," *see* 11 P.S. § 2203, and does not, therefore, fall within the purview of the Child Protective Services Law. *See Pennsylvania State Educ. Assoc. v. Department of Public Welfare*, 68 Pa.Cmwlth. 279, 449 A.2d 89 (1982). Thus, defendants Smith, Miller and Shuey were under no statutory duty to report suspected instances of sexual assault that occurred in the Bradford Area High School.

The Court is not persuaded that the failure of the State to impose a statutory duty, to mandatorily report suspected cases of child abuse perpetrated by school teachers, is controlling in this case. In ruling as it did in *Pennsylvania State Education*, the Commonwealth Court merely concluded that the Child Protective Services Law was intended to focus on and remedy abuse that occurred within the structure of a family or a family-like environment. Accordingly, the court observed that "the clear import of ... [the statutory language] is that persons responsible for the child's welfare customarily provide such matters as housing, clothing, furnishings, income and medical care for children

The Supreme Court's opinion in *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) opened the door to the concept that "duty" in a constitutional tort could be contingent on the finding of a special relationship. In *Martinez* a civil rights action was brought by the parents of a young woman who was murdered by a state parolee. Although the focus of the dismissal was on lack of causation—the murder did not occur until five months after the parole—the Supreme Court did imply that under a different set of circumstances, at least a duty might be imposed. *See Martinez*, 444 U.S. at 285, 100 S.Ct. at 559.

Courts were quick to pick up on the Supreme Court's implications. Thus, in certain § 1983 cases the focus became the nature of the relationship between the plaintiff and the state actor.[14] *See, e.g., Estate of Bailey*, 768 F.2d at 510; (action brought by father against agency charged with protecting child from abusive family situations); *Fox v. Curtis*, 712 F.2d 84 (4th Cir.1983); (action brought against state corrections employees who were charged with postrelease supervision of a parolee); *Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982); *Doe I*, 649 F.2d 134 (action brought against state agency charged with overseeing foster care placements); *P.L.C.*, 568 F.Supp. 961 (action brought by female resident against Housing Authority).

The court's opinion in *Bowers v. DeVito* is worth additional consideration. That case was brought on behalf of a woman who was murdered by a person who had been recently released from a state mental facility. The offender had a seven year record of severe mental health problems and was known by the state actors to be extremely violent. In affirming the summary judgment order, entered on behalf of the State, the appellate court announced that "there is no constitutional right to be protected by the state against being murdered by criminals or madmen." *Bowers*, 686 F.2d at 618. The court did go on to qualify that statement, however.

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm is clearer than it is. *If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.* It is on this theory that state prison personnel are sometimes held liable under section 1983 for the violence of one prison inmate against another.

*Id.* (emphasis added).

Returning to the instant action, it is clear that although the plaintiff was not within the custodial care of the defendants, she did spend a large part of her day in an environment where defendants had ultimate control. As principal, assistant principal and superintendent of the Bradford Area High School, the defendants possessed certain power and were cloaked with certain authority.[15] These defendants

---

in their care." *Pennsylvania State Education*, 68 Pa.Cmwlth. at 283, 449 A.2d at 92. Teachers do not serve those functions and are not, therefore, covered by the Act.

Notwithstanding the court's observation, regarding the noncustodial role of teachers, teachers and school administrators do stand in a special relationship with students. Children are required by law to attend school. *See* 24 P.S. § 13–1327. And teachers and administrators are vested, by law, with certain authority over children who attend their schools. *See* 24 P.S. § 13–1317. Clearly, then there is a special relationship that exists among these parties.

**14.** Interestingly, some courts have identified the "special relationship" as a relationship between the plaintiff and the third person who committed the wrongful act. For example, in *Humann v. Wilson*, 696 F.2d 783, 784 (10th Cir.1983) it was noted: "the Court considered the fact that the plaintiffs' decedent did not stand in any special relationship to the parolee from which the parole officers might have inferred a special danger to her."

**15.** 24 P.S. § 13–1317 specifically provides:

Every teacher, vice principal and principal in the public schools shall have the right to exercise the same authority as to conduct and behavior over the pupils attending his, school, during the time they are in attendance, including the time required in going to and from their homes, as the parents, guardians or persons in parental relation to such pupils may exercise over them.

were charged with the duty of ensuring that the school environment was a safe one for students. Therefore, this Court concludes that a special relationship exists between the plaintiff and the individual defendants.

### ii. Breach of duty

■ The next issue before this Court is whether the defendants have breached their duty to the plaintiff. The defendants assert that any professional decisions they made are presumptively correct and that liability could not attach under such a circumstance. Accordingly, the defendants rely on the Supreme Court's decision in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

The issue in *Youngberg* involved the due process rights of an individual committed to a state institution for the mentally retarded. After holding that the plaintiff had certain due process rights, the Court went on to explain that those rights were not absolute. Rather, the Court advised, a balance must be reached between the rights of the individual and the day-to-day demands realized by the institution. In recognizing this balance, the Supreme Court adopted the position set forth by Chief Judge Seitz's in his concurring opinion.

Accordingly, the Supreme Court held:

We think the standard articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that 'the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.'

*Youngberg,* 457 U.S. at 321, 102 S.Ct. at 2461.

The Supreme Court went on to hold that in deciding what is "reasonable" the courts must afford deference to the judgment of professionals. Thus:

the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* at 323, 102 S.Ct. at 2462.

The defendants in the instant action argue that since the plaintiff's claim of liability is based on policy decisions made by Shuey, Smith and Miller, *i.e.,* failing to investigate Wright's background before hiring him and failing to detect and/or investigate students' complaints of abuse, *Youngberg* controls. "Neither this Court nor any jury is permitted to substitute its judgment for that of the professionals to whom these matters are properly delegated." *See* Defendants Brief Submitted in Companion Case at 24. Therefore, according to the defendants, the policy decisions are presumptively correct and the plaintiffs' basis for liability must fail.

The flaw in defendants' argument is that it fails to take into account the situation where a decision, though made by a professional, is a "substantial departure from accepted professional judgment, practice or standards." In such a case the presumption of correctness is negated. The plaintiff must be afforded an opportunity to rebut the presumption of correctness.[16]

In opposition to the defendants' motion for summary judgment, the plaintiff submitted the affidavit of Dr. Chet C. Kent, Superintendent of Keystone Oaks School District, Pittsburgh, Pennsylvania. The affidavit states that the policies adopted by

---

**16.** As the Supreme Court noted in *Youngberg:* All members of the Court of Appeals agreed that respondents' [plaintiff's] expert testimony should have been admitted.... [W]e have no reason to disagree with the view that the evidence was admissible. It may be relevant to whether petitioners' [defendants'] decisions were a substantial departure from the requisite professional judgment.
*Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462.

the defendants, for dealing with suspected cases of sexual assault or sexual harassment, deviated significantly from the norm. *See* Affidavit of Dr. Kent at 14, 18–22. Based on the affidavit of Dr. Kent, this Court concludes that there are genuine issues of material fact pertaining to the question of defendants' compliance with "accepted professional judgment, practice or standards."

### iii. Applicable standard

■ The final inquiry pertaining to the liability of the individual defendants is the standard to be applied. In its recent decision of *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Supreme Court held that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty or property." *Id.* 106 S.Ct. at 663. Thus, it has been held that more than mere negligence is needed to establish liability on the part of state actors.

Despite defendants' allegations that "the record is bare of any conduct of these defendants that even begins to approach the requisite standard," *see* Defendants' Brief Submitted in Companion Case at 21, this Court finds that the plaintiff has presented sufficient evidence to suggest that there is a genuine issue of material fact. In addition to the affidavit of Dr. Kent, there is evidence by which a jury could conclude that: (1) the defendants were reckless in their handling of the 1979 incident involving Judy Grove Sowers; (2) the defendants were reckless in their failure to investigate other reported incidents involving Mr. Wright and female students and (3) the defendants were reckless in their attempts to remedy and/or rectify the problems involving Mr. Wright. In light of this evidence this Court holds that the issue of liability is one for the jury to decide.[17]

17. The defendants also contend that there is no evidence that their acts were the cause of the injuries sustained by the plaintiff. Again, this Court concludes that this issue is one best left for the jury. The deposition testimony suggests that the defendants' handling of the incident involving Judy Sowers Grove provided Mr.

### b. Liability of the School District

■ The pivotal case in the area of municipal liability under section 1983 is *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Reversing its earlier decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court in *Monell* held that a municipal corporation is a person for purposes of § 1983. Therefore, a municipality may be liable for damages that arise out of a violation of a constitutional right. As determined by the Court in *Monell*, however, municipal liability is not without limits.

In addressing the exposure of municipal corporations to § 1983 liability, the *Monell* Court excluded liability based on principles of respondent superior. The Court noted: "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037.

The Court in *Monell* did not delve into the differences between a "policy" and a "custom," but did point out that municipal liability could attach if either were established. Advisedly, the Court noted:

although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued

Wright with additional ammunition with which to coerce and/or manipulate the plaintiff. *See* Deposition of Kathleen Stoneking at 225, 250–51 (September 12, 1986). *See also* Deposition of Kim Harbaugh at 409–16, 432–34; Deposition of Lisa Rovito at 173, 234.

for constitutional deprivations visited pursuant to governmental "custom" *even though such a custom has not received formal approval through the body's official decisionmaking channels.*

*Id.* 690–91, 98 S.Ct. 2035–36 (Emphasis added).

In recent cases the Supreme Court has expounded on the issue of "municipal liability." *See, e.g., Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 851 L.Ed.2d 791 (1985). The Court's holding in *Brandon* is particularly instructive.

*Brandon* was instituted by individuals who had been "viciously assaulted" by a Memphis City police officer; the action was filed against the director of the police department in his official capacity. In awarding the plaintiffs compensatory damages the district court concluded that the director of the department, although *without* actual knowledge, should have known that the police officer who perpetrated the attack had "dangerous propensities." Holding that the director was shielded from liability by the doctrine of qualified immunity, the appellate court reversed the district court's decision.

The Supreme Court was of a different opinion. The Court concluded that "judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond." *Brandon,* 469 U.S. at 471–72, 105 S.Ct. at 878–79. Thus, liability imposed on the Director of the City Police, in his official capacity, would result in liability on the part of the municipal entity.

Decided just a few months after *Brandon,* the Court's decision in *Tuttle* addresses a different aspect of municipal liability. In *Tuttle* the Court was called on to decide whether jury instructions in a "failure to adequately train" case comported with the applicable law. In reaching its decision that the charge did not comport with the

law, the Court expounded on the requirement of an official custom or policy.

The Court attempted to distinguish the difference between a policy or custom that was itself unconstitutional and one that was not.[18] The Court set forth the following parameters.

Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

Read together, *Brandon* and *Tuttle* seem to suggest at least two conclusions. First, if a "municipal servant" is found to be liable, in his or her official capacity, for constitutional violations, then, the municipality will also be liable. Second, if a policy, practice or custom of a municipal entity is not itself unconstitutional, liability will only attach if there is proof of more than a single episode of a constitutional deprivation.

In the instant action, the plaintiff alleges that the School District, acting through Dr. Smith, Mr. Miller and Mr. Shuey, had a practice or custom of failing to take appropriate action with respect to teachers who posed a threat to the health, safety and welfare of female students. More specifically, the plaintiff alleges that the School District failed to investigate reports of sexual abuse and permitted teachers to remain in charge of extracurricular activities despite the knowledge that these teachers presented a danger to female participants. According to the plaintiff, the above men-

---

**18.** The Supreme Court expressly declined to rule on the issue of whether a policy that was not itself unconstitutional could ever meet the

policy requirement of *Monell. Tuttle,* 471 U.S. at 804 n. 7, 105 S.Ct. at 2436 n. 7.

tioned practice or custom of the School District was the proximate cause of her injuries.

In order to determine whether the School District, acting through its agents, had a practice or custom that "caused" the plaintiff's injuries, such that municipal liability will attach, this Court must review the allegations and depositions. The first incident that purports to support the inference that the defendants had a practice or custom occurred in late 1977 or early 1978.[19]

According to the deposition testimony of Theresa Rodgers, she was sexually accosted by her social studies teacher, Richard DeMarte, in her senior year. Ms. Rodgers testified that she immediately reported this incident to Mr. Miller and Dr. Smith, whereupon she was warned that it was going to be her word against Mr. De-Marte's and that she should not go home and tell her parents about the assault. Ms. Rodgers further testified that the principal suggested that she stay away from Mr. DeMarte, if at all possible, and then counselled her that he would take care of it. Deposition of Theresa Rodgers at 113–14.

Despite Dr. Smith's assurance that "he would take care of it," Theresa Rodgers was never informed of any action taken against Mr. DeMarte. Mr. DeMarte's personnel file, maintained by the School District, conspicuously lacks any record of disciplinary action taken against him during the pertinent time period. In fact, Dr. Smith gave Mr. DeMarte a perfect score on his teaching evaluation, remarkably, an evaluation that included assessment of "emotional stability," "social adjustment," "judgment" and "habits of conduct." *See* Plaintiff's Exhibit 4 filed in Companion Case.

Additionally, female students voiced complaints against Mr. DeMarte in January, 1981; March, 1981; November, 1982 and October, 1985.[20] Dr. Smith and Mr. Miller had direct notice of all these complaints. Mr. Shuey was informed of at least two of the above noted complaints. *See* Defendants' Second Supplemental Brief Submitted in Companion Case at 4. The personnel file of Mr. DeMarte is silent as to these incidents. Furthermore, it is not clear what, if any, disciplinary action was taken against the teacher. Significantly, Mr. DeMarte is still coaching the girls' tennis team.

The next critical series of events, upon which liability of the School District is based, occurred in the fall of 1979. At that time, Judy Grove, a high senior and member of the band, reported to Mr. Miller and Dr. Smith that the band director, Edward Wright, had sexually assaulted her.[21]

It will fall to a jury to ascertain the exact sequence of events that immediately preceded and followed Judy Grove's disclosure. A review of the deposition testimony of Frederick Smith, Richard Miller, Judy Grove, and her father, Hayward Grove, demonstrates a great divergence of views. However, for purposes of summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Additionally, the Court must consider reasonable inferences that might be drawn in favor of the plaintiff. Since the testimony of Judy Grove is most favorable to the plaintiff, the Court will review that testimony in some detail.[22]

Although Ms. Grove's recollections, regarding specific dates and times, were somewhat vague, her deposition testimony was rather emphatic on other points. Judy Grove testified that she relayed the incident of the sexual assault to both Mr.

---

19. *See* Deposition of Theresa Rodgers at 108.

20. As conveyed to the administration, Mr. De-Marte attempted to molest a young woman during Homecoming activities. Both Dr. Smith and Mr. Miller received notice of the complaint.

21. Mr. Miller testified that, prior to talking to Judy, he had received a phone call from Mr. Wright informing him about the "rumors" in-

volving Ms. Grove. Apparently, Mr. Wright was seeking advise on how to quiet the rumors. *See* Deposition of Mr. Miller at 55–56.

22. Despite defendants' characterization of Ms. Grove's testimony as "ridiculous," "preposterous" and "incredible," *see* Defendants' Supplemental Brief Submitted in Companion Case at 4, 9, the Court accepts the testimony as plausible.

Miller and Dr. Smith.[23] According to her testimony, Dr. Smith implied that in light of the circumstances—Judy had been drinking on the evening of the assault—she was responsible for the assault. Dr. Smith warned that she would not look good if the facts got out. Judy reports that she was frightened and felt as though she was receiving no support from the Administrators. It was only after being threatened with public disclosure and personal humiliation that Judy retracted, in a rather flippant fashion, that the assault had occurred.[24]

Sometime after these initial meetings, Judy's father requested a conference. Prior to inviting Judy into the conference, Mr. Miller and Dr. Smith talked with Mr. Grove. Mr. Grove testified that an effort was made to convince him that no teacher would behave in the fashion alleged by Judy. *See* Deposition of Hayward Grove at 36, 41. Although when Mr. Grove entered the meeting he was confident that his daughter's version of the facts were true, he admitted to being less certain after conferring with these Administrators. *Id.*[25]

One of the topics of discussion at the above mentioned conference was whether Judy would be able to remain in the band.

As perceived by both Judy and her father she had a choice: recant her story in front of the assembled band or withdraw from all band activities. *See* Deposition of Judy Grove at 59–60, 68; Deposition of Hayward Grove at 44, 47, 49. As recalled by Judy, the suggestion to appear before the band and dispel the "rumors," about Mr. Wright, originated with Dr. Smith. *See* Deposition of Judy Grove at 74 (September 12, 1986).

In early January, 1980, Dr. Smith assembled all the band members.[26] He proceeded to acknowledge that rumors had been circulating and that a certain student would address those rumors. The floor was turned over to Judy. As recalled by Judy, pressed with questions by her peers, she fled the room in tears. It is not clear whether an apology was ever actually offered.

The episode of the forced apology has special significance in light of the assaultive conduct that occurred between Edward Wright and Kathleen Stoneking. Apparently, the "forced apology" served as a trump card in the hands of Edward Wright. When a student would threaten to disclose the abuse, Wright quickly reminded his victim about the "Judy Grove incident." His message was clear and convincing: "No

---

**23.** Mr. Shuey was apprised of the incident involving Judy Grove and Edward Wright by both Mr. Miller and Dr. Smith. *See* Deposition of Mr. Shuey at 17–22.

**24.** Q: He, [Dr. Smith] told you it was your fault, or is that the impression you had?
A: No. He said it was my fault. That's why he wanted to clear up the rumors because he wanted the band to get back on their feet again.
Q: Did you tell him during that conversation that the rumors were not correct?
A: He had told me that if the rumors were true I would be—I could find myself in front of a jury, in front of a judge, telling exactly what happened, that being that I had been drinking [and that I was] at his house voluntarily, I would look like—I wouldn't look very good, is what he said. At that point I said, "Forget it. It's not true."
Q: So whatever the reason, you did tell Dr. Smith that these rumors were not true—
A: He told me that my parents would be called; he would call my father down and my mother right then. I said, "Forget it. I don't want to go through with it." You know.

"Just forget it."…. "If I have to go through all of this they're not true."
Deposition of Judy Grove at 46–47 (September 12, 1986).

**25.** Another critical fact relates to Judy's deliberate attempt to seek help from Gene Dillard, an independent alcohol and drug counsellor. Mr. Dillard spent time at the Bradford Area High School in September, 1979. At the conclusion of all group informational sessions, Mr. Dillard invited students to talk with him individually. Judy Grove seized that opportunity and confided in Mr. Dillard.
As set forth in his deposition testimony, Judy told Mr. Dillard that she had been sexually assaulted by Mr. Wright. With the express consent of Judy, this information was directly relayed to Dr. Smith and Mr. Miller. Mr. Dillard offered his opinion that other students had probably been subject to Wright's abuses. The Administrators assured Mr. Dillard that the matter would be taken care of.

**26.** At, or about the same time, Dr. Smith directed Mr. Wright to cease all one-on-one contact with female students. The enforcement of this directive was left solely up to Mr. Wright.

one believed Judy Grove, why would any-one believe you." *See infra* Note 17. His tactical threat proved to be quite effective at least for a period of time.

In reviewing the above events, for the purpose of evaluating the liability of the School District, this Court need not decide whether the School District had a practice or custom, of dealing with complaints of sexual abuse or harassment, which "caused" the plaintiff's injuries. Nor is it for this Court to determine whether Dr. Smith, Mr. Miller and Mr. Shuey are liable in their official capacities, such that liability could be imputed to the School District. *See Brandon*, 469 U.S. 464, 105 S.Ct. 873. Rather, this Court is charged with the task of evaluating the record evidence and determining whether genuine issues of material facts exist. The ultimate issue of liability is one with which the jury must wrestle.

For the purposes of this motion, the Court concludes that there is sufficient evidence from which a jury could infer the existence of a practice or custom. Additionally, it could be inferred from the evidence that the School District was responsible for the practice or custom and that the practice or custom caused the plaintiff's injuries. Thus, the defendants' motion, as it pertains to the liability of the School District, must be denied.

### C. Qualified Immunity

■ The standard to be applied in resolving a qualified immunity issue is well-settled. In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court revised the qualified immunity standard and held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights, of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Thus, the pending question, in terms of the qualified immunity defense, is whether the plaintiff had a constitutional right which at the time

of the alleged violation, was clearly established.

As the Court concluded in Section IV B (1) of this opinion, the plaintiff has alleged a viable claim of a constitutional violation. According to the Court's conclusion, there is a special relationship that existed between the plaintiff and the individual defendants. As a result of this relationship defendants had a duty to provide a reasonably safe environment for the plaintiff. There is nothing new or novel about this constitutional right or this duty. *See, e.g., Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980); *Spence v. Staras*, 507 F.2d 554 (7th Cir.1974); *Withers v. Levine*, 615 F.2d 158 (4th Cir.1980); *Doe I*, 649 F.2d 134 (2d Cir.1981); *Stokes v. Delcambre*, 710 F.2d 1120 (5th Cir.1983).

This Court concludes that a reasonable person would have been aware that the plaintiff had a substantive due process right to be free from intrusions into her "personal privacy and bodily integrity." As the court in *Hall v. Tawney*, 621 F.2d 607 (4th Cir.1980) so aptly stated:

[t]he existence of this right to ultimate bodily security—the most fundamental aspect of personal privacy—is unmistakably established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process. Numerous cases in a variety of contexts recognize it as the last line of defense against those literally outrageous abuses of official power whose very variety makes formulation of a more precise standard impossible. Clearly recognized in persons charged with or suspected of crime and in the custody of police officers, we simply do not see how we can fail also to recognize it in public school teachers.

*Id.* at 613. Thus, defendants are not entitled to qualified immunity.

### D. Pendent State Claims

■ Since the Court denied the defendants' motion for summary judgment, as it pertained to the plaintiff's § 1983 claims, this Court retains subject matter jurisdic-

tion over the pendent state claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The only remaining question is whether the complaint sets forth state law claims. The plaintiff's complaint does not identify a specific state law cause of action;[27] the pleadings are not sufficient to give notice of the claim alleged. Thus, this Court concludes that the motion for summary judgment, as it pertains to the state law claims set forth in Counts II, IV and VI, is granted.

An appropriate order shall be issued.

---

**27.** Reference in the complaint to 42 Pa.C.S.A. § 8550 appears to be offered only as a means of demonstrating that the doctrine of "official immunity" may fail to shield these defendants from suit.

In part, 42 Pa.C.S.A. § 8550 provides:

In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of the sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.