Judy Grove SOWERS, Plaintiff,

v.

**BRADFORD AREA SCHOOL DISTRICT;**
Frederick Smith, in his individual and
official capacity as Principal of the
Bradford Area High School; Richard
Miller, in his individual and official
capacity as Assistant Principal of the
Bradford Area High School; and Frederick Shuey, in his individual and official capacity as Superintendent of the
Bradford Area School District, Defendants.

Civ. A. No. 88–57.

United States District Court,
W.D. Pennsylvania.

Aug. 29, 1988.

Wallace J. Knox, Sean J. McLaughlin, Knox, Graham McLaughlin Gornall & Sennett, Inc., Erie, Pa., for plaintiff.

Kenneth D. Chestek, Erie, Pa., James W. Harvey, Pittsburgh, Pa., for defendants.

## MEMORANDUM OPINION

MENCER, District Judge.

This is a civil rights action brought under 42 U.S.C. § 1983 [§ 1983] by a former Bradford high school student, Judy Grove Sowers, against the Bradford Area School District ["school district"], the school district's superintendent, Frederick Shuey, and the high school's principal and assistant principal, Frederick Smith and Richard Miller. This is the third suit filed against these same defendants by former female students. This case centers on a June 16, 1979 sexual assault upon the plaintiff, then a high school student and member of the marching band by the band director, Edward Wright.

Count I of the complaint is against the school district and alleges that there existed a pernicious practice, custom and/or policy, prior and subsequent to the assault by Wright, of reckless indifference to and/or active concealment of instances of known or suspected sexual abuse of students by teachers. It further alleges that this created a climate wherein child abusers, such as Wright, could prey upon female students with impunity. The complaint alleges that the School District's conduct was a proximate cause of a deprivation of the plaintiff's constitutional rights to freedom from sexual abuse and free access to the courts unimpeded by threats, coercion or intimidation, as well as severe mental anguish, embarrassment, humiliation and emotional distress.

Count II alleges that the individual defendants were members of a conspiracy whose purpose was to conceal from the

public instances of known and/or suspected sexual abuse of students by various teachers. The alleged overt acts in furtherance of the conspiracy included, *inter alia*, the alleged co-conspirators' failure to respond appropriately to the complaints of sexual abuse and defendant Smith's keeping of a personal, secret file in his desk drawer at home memorializing many of the complaints against teachers, as well as the explicit or tacit agreement of each of the alleged co-conspirators. The alleged proximate results of the conspiracy are the same as those under Count I.

## FACTS

At the heart of this suit is the allegation that on June 16, 1979, Sowers,[1] a member of the school marching band, was sexually molested by Edward Wright, the band director.[2] Wright had been hired by the school district in 1976, with responsibility to supervise band activities and provide music lessons to students. Prior to 1976, Wright had been the band director in the Jasper School District, where the complaint alleges he "had attempted to sexually molest and/or harass various female students." Complaint at par. 20. The complaint alleges that the defendants had been on notice of Wright's proclivities with respect to female students prior to the June, 1979 assault, although the complaint does not detail how it was that they had been put on such notice. Complaint at par. 26(c).

Sower's complaint asserts that Wright's assault on her was just one in a series of incidents in which the defendants, although informed by female students of sexual abuse by teachers, took no action except to conceal the problem. The complaint alleges that prior to the June 16, 1979 assault, during the 1977–78 school year, a female senior informed defendants Smith and Miller that a history teacher (and coach of the girls' tennis team) had made improper sexual advances toward her in a classroom. Complaint at par. 26(a). Smith and Miller told her not to tell her parents about the incident, and no disciplinary action was pursued against the faculty member. *Id.* In 1978 and periodically thereafter, Smith, Miller and school district superintendent Shuey were alleged to have received other complaints of sexually abusive language and/or improper sexual advances by a shop teacher. Complaint at par. 26(b). The defendants allegedly pursued no disciplinary action against the shop teacher. *Id.*

Edward Wright's sexual assault on Judy Grove Sower's occurred on June 16, 1979. According to her deposition, she went to Wright's house to obtain a tape of marching music. Sowers was a section leader and had to learn the music for summer band practice. She was going away the next day for two weeks, therefore she had to obtain the tape so she could learn the music prior to the commencement of summer band practice. Sowers Deposition at 16. She reported the assault to Gene Dillard, a youth counselor visiting the school at the invitation of the school administration. Complaint at par. 13. Dillard informed Smith and Miller, as well as a school guidance counselor, of the sexual abuse and harassment by Wright. He told them he considered her reports to be truthful. *Id.* at par. 14. Soon thereafter, Sowers met with Smith and Miller and personally informed them of the sexual assault by Wright. Other meetings were held during the fall and early winter between Sowers, Smith and Miller. *Id.* at par. 15. The plaintiff alleges that Smith and Miller actively discouraged her from pursuing her remedies in court against Wright "through intimidation, threats and coercion," and indicated that they did not believe her. *Id.* at par. 16. In January 1980, Smith told Sowers that if she wanted to remain in the school marching band she would have to publicly apologize for having accused Wright of the sexual assault. *Id.* at par. 17. When Smith had assembled the band members, Sowers did not apologize, instead

---

1. At the time of the assault, the plaintiff's name was Judy Grove. This action is brought under the name Sowers, the plaintiff's married name. We will refer to her by that name as well.

2. On November 6, 1986, Edward Wright plead guilty to a ten count criminal indictment which included four counts of indecent assault.

leaving the band room "in an extremely emotional state." *Id.* at par. 18.

The plaintiff's complaint goes on to list numerous instances where female students reported subsequent episodes of sexual abuse by Wright and other male teachers at the Bradford high school to the defendants. *Id.* at pars. 26(d)–(1). In none of these cases did the defendants pursue disciplinary action against the molesting male teachers beyond issuing an occasional "no one-on-one" directive. For example, in late September or early of 1984, a female band member told her guidance counselor that Wright had attempted to sexually molest her in a vehicle. *Id.* at par. 26(i). This student also told the counselor that Wright was currently molesting another student and had molested yet another student who had graduated. *Id.* The accusation was relayed to defendants Smith and Shuey. On December 15, 1984, Smith met with Wright and issued another "no one-on-one" directive, but informed Wright that "no one accused him of any wrongdoing." *Id.* at par. 26(j). The plaintiff also alleges that Smith maintained a personal, secret file in his desk drawer at home, memorializing many of the complaints. *Id.* at par. 37. The school administration's alleged toleration of Wright's abuse of female students came to an end in March of 1986 when fresh allegations brought about meetings between school administrators and parents of children who had been assaulted by Wright. Wright was suspended as of March 10, 1986, and later resigned.

## DISCUSSION

### I. *Defendants' Motion to Strike Portions of the Complaint*

The defendants' move to strike portions of paragraphs 25 and 26 of the complaint, as well as all of paragraph 20. They assert that paragraphs 25 and 26 "contain immaterial, impertinent and scandalous matters, consisting of allegations of conduct involving teachers other than

Plaintiff, students other than Plaintiff, and conduct subsequent to the alleged injury to Plaintiff, all of which has no bearing in any way on the alleged injury to this Plaintiff." Defendants Motion to Dismiss and/or Strike, p. 2. Paragraph 25 mentions no teachers or students at all, thus we do not understand the defendants' reason for striking it, and we will not do so. Paragraph 26 indeed refers to teachers other than Wright, and students other than the plaintiff (albeit these students are referred to by initials, not by name). Because the plaintiff's case depends upon establishing a policy or custom which was adhered to in response to numerous allegations of child abuse by various teachers at the school district, such allegations are relevant to her case. While we agree with the defendants that the conduct described in these allegations could be viewed as scandalous, we do not agree that they are immaterial or impertinent, and we will deny their motion to strike.

### II. *Defendants' Motion to Dismiss the Complaint*

The defendants offer a number of grounds for dismissal of the Sowers' complaint against them, allegations the defendants scorn as "impertinent." [3] Defendants' Brief in Support at 2; *see also* Defendants' Motion to Dismiss and/or Strike, p. 2. Defendants argue that the complaint fails to state a claim under § 1983 and that the action is barred by the two-year statute of limitations.

In order to properly decide the motion to dismiss, it is necessary to analyze the required elements of a cause of action under § 1983, as well as the questions surrounding the limitations period. An analysis of the most salient issues begins with the question of whether the plaintiff's complaint alleges a deprivation of a constitutional right "under color of law." In cases such as this where a plaintiff alleges that the defendants' policy or custom resulted in

---

**3.** It is unclear whether the defendants intend the word "impertinent" in the sense of "presumptuous, rude, uncivil," or "not pertinent, irrelevant." *See Random House Collegiate Dictionary,* revised ed. 1980, p. 667. If true, the plaintiff's allegations are anything but impertinent, in either sense of the word.

the failure to carry out an alleged duty to protect the plaintiff, a court must find a "special relationship" between the plaintiff and the state body or official creating a duty to protect. In addition, where a claim is based upon a failure to act by the defendants, a court must consider whether that failure to act: (1) was a substantial factor leading to a violation of a constitutionally protected liberty or property interest; and (2) displayed "deliberate indifference" or "gross negligence" with regard to that violation.

### A. Standard for Deciding a Motion to Dismiss

A motion to dismiss tests the formal sufficiency of the statement of the claim for relief, addressing itself solely to the failure of the complaint to state a claim for relief. Wright & Miller, *Federal Practice And Procedure* § 1356 (1987 Supp.). To merit dismissal, the plaintiff's pleading must fail to meet the liberal requirements for pleading a claim set forth in Rule 8(a), which calls for "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.;* Fed.R.Civ.P. 8(b). For purposes of the motion to dismiss, the complaint is construed in the light most favorable to the plaintiff and its allegations taken as true. *Id.* at § 1357. In general, a court has broad discretion in ruling on a motion to dismiss, but dismissal should only be granted with care in order to avoid improperly denying plaintiff the opportunity to have her claim adjudicated on the merits. *Id.* "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his claims." *Estate of Bailey By Oare v. County of York*, 768 F.2d 503 (3d Cir.1985) *(quoting Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)).

### B. Deprivation of a Constitutional Right "Under Color of State Law"

■ To state a claim under § 1983 an individual must allege facts constituting a deprivation of a constitutional right under color of state law. An official's actions are not removed from under color of state law merely because the official acted beyond the scope of the authority granted by state law. Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is taken "under color of" state law. *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941); *Doe "A" v. Special School Dist. of St. Louis Co.*, 637 F.Supp. 1138, 1142 (E.D.Mo.1986); *accord Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The plaintiff's complaint alleges that there existed a practice, custom and/or policy which caused the deprivation of her constitutional rights. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed. 2d 611, 638 (1978); *see also Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 506 (3d Cir.1985). "In an appropriate case, even in the absence of formal agency conduct, an 'official policy' may be inferred 'from informal acts or omissions of supervisory municipal officials.'" *Estate of Bailey by Oare*, 768 F.2d at 506 (*quoting Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980)). By these standards, we believe the complaint sufficiently alleges that the defendants caused a deprivation of her constitutional rights "under color of state law." [4]

### C. Special Relationship

■ In § 1983 actions such as this one where a plaintiff asserts a right of protection, courts require that there exist a "special relationship" between the plaintiff and defendant which would create a duty to

---

**4.** Public officials are liable under § 1983 if the official *causes* an individual to be deprived of a constitutional right. *Baker v. McCollon*, 443 U.S. 137, 142, 99 S.Ct. 2689, 2693, 61 L.Ed.2d 433, 440 (1979).

protect. *See Jensen v. Conrad,* 747 F.2d 185, 194–95 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). In *Bowers v. DeVito,* 686 F.2d 616 (7th Cir.1982), the Seventh Circuit refused to hold the state liable for a murder committed by a schizophrenic (with a history of criminal violence) one year after being released from a state mental hospital. Judge Posner stated "there is no constitutional right to be protected by the state against being murdered by criminals or madmen." *Bowers,* 686 F.2d at 618. Judge Posner, a jurist renowned as a theorist in tort law, acknowledged that where the state is responsible for placing a person in a position of danger or potential harm, the state would owe an affirmative duty obligating the state to protect that person. Judge Posner wrote:

> If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tort feasor as if it had thrown him into a snake pit. It is on this theory that state prison personnel are sometimes held liable under section 1983 for the violence of one prison inmate against another.

*Bowers,* 818 F.2d at 618. The Fourth Circuit later noted that the *Bowers* finding that the general public has no constitutional right to protection, and the state no duty to protect, from criminals and madmen, was expressly qualified by its acknowledgment that "such a right and corollary duty may arise out of *special custodial or other relationships* created or assumed by the state in respect of particular persons." *Fox v. Custis,* 712 F.2d 84, 88 (4th Cir.1983) [emphasis added]. Courts have found the "special relationship" requirement, the nexus between a plaintiff and the state necessary to an action under § 1983, to be a standard that is elusive and difficult to define.

*Estate of Bailey by Oare v. County of York* involved a county children's services agency's involvement in the tragic abuse and death of a five-year-old girl. 768 F.2d 503 (3d Cir.1985). The girl lived with her mother and her mother's boyfriend when relatives noticed severe bruises and other evidence of abuse on the child's body. When the relatives contacted the police and the child services agency, the agency had the girl examined by a physician. The physician advised that the boyfriend be denied access to the child, and that the girl should be taken from the mother if necessary to deny the boyfriend access. The next day the county agency returned the child to the mother's custody, undertaking no independent investigation to determine what access the boyfriend might have. A month later the girl died from physical injuries inflicted on her by the boyfriend and mother. *Id.* 768 F.2d at 505. The Third Circuit found there to be a "special relationship" between the little girl and the childrens services agency and the county, noting that the plaintiff alleged that the defendants had evidence of previous abuse, was aware of the source of abuse and inadequately investigated the danger. The circuit court therefore vacated and remanded the district court's granting of the defendants' motion to dismiss. *Id.* at 510. "When the agency knows that a child has been beaten, '[t]his strengthens the argument that some sort of special relationship has been established.'" *Id.* at 510–11 (*quoting Jensen v. Conrad,* 747 F.2d 185, 195 n. 11 (4th Cir. 1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985) (suggests special relationship where state agency failed to intervene to prevent beatings of children by their guardians)).

The Third Circuit's "special relationship" analysis in *Estate of Bailey by Oare* highlighted two cases as examples of instances where a "duty of protection has been found owing by the state and local entities to persons who were not in custody." *Id.* at 510. The first was *White v. Rochford,* 592 F.2d 381 (7th Cir.1979), in which the Seventh Circuit reversed the dismissal of a complaint alleging that police who had arrested the driver of a car subjected the three passenger children to a health-endangering situation by abandoning them. That court had reasoned that "the police could not avoid knowing that, absent their assistance, the three children would be sub-

jected to cold weather and danger from traffic. This indifference in the face of known dangers certainly must constitute gross negligence." *Id.*, 592 F.2d at 385. The second example given was *Thurman v. City of Torrington*, 595 F.Supp. 1521 (D.Conn.1984), which involved an allegation local police systematically failed to adequately protect women abused or assaulted by a spouse or boyfriend. The *Thurman* court stated, "City officials and police officers are under an affirmative duty to preserve law and order, and to protect the personal safety of persons in the community." *Id.*, 595 F.Supp. at 1527. This duty was held to require officials having notice of the possibility of attacks on women in domestic relationships "to take reasonable measures to protect the personal safety of such persons in the community." *Id.*

There is a significant, although not dispositive, distinction between the facts of *Estate of Bailey by Oare*, *White* and *Thurman* on the one hand, and the present case. In those cases, the plaintiff toward whom a special relationship and duty existed had been individuals whose specific need for state protection were identifiable prior to their injury. In the present case the vulnerability to sexual abuse due to the defendants' customs, practices and/or policies was shared by *all* the female students at the high school. Even if the plaintiff's allegation that the defendants had prior notice of Wright's propensity for sexual abuse is taken as true, the potentially endangered group would include, at the least, all females belonging to the marching band.[5]

A number of cases have found a "special relationship" to exist when an identifiable group, rather than a specific individual, was endangered. In *P.L.C. v. Housing Authority of County of Warren*, a tenant in a public housing project brought a civil rights action after she was raped by a county housing authority employee who entered her apartment using a housing authority key. 588 F.Supp. 961 (W.D.Pa. 1984). Her complaint alleged that the housing authority knew or should have known of the assailant's prior convictions for rape and his alcoholism when they hired him as a maintenance man. *Id.*, 588 F.Supp. at 962. In *P.L.C.*, as in the case at bar, the danger posed by the housing authority's conduct (or lack thereof) was shared by the plaintiff as a member of an identifiable group of potential victims, i.e., the female residents of the housing project. Judge Weber found "that the authority and its officials stood in a special relationship to this particular plaintiff." *Id.*, 588 F.Supp. at 965.[6]

Similarly, in *Beck v. Kansas Univ. Psychiatry Foundation*, 580 F.Supp. 527 (D.Kansas 1984), two individuals were shot to death at the University of Kansas Medical Center emergency room by a released prisoner with a known propensity for violence against the medical center, its staff, patients and visitors. *Id.*, 580 F.Supp. at 531. Denying a motion to dismiss by the defendant Kansas Adult Authority, the state agency which released the assailant despite knowledge of his potential for violence at the medical center, the court found that the Adult Authority had a duty to take into account "the best interests of society." The court concluded that "[c]ertainly that duty includes taking into account the special danger which the inmate may have to an identifiable group or individual." *Id.*, 580 F.Supp. at 534. Thus, a special relationship was found between the state authority and an identifiable group, namely the staff, patients and visitors of the medical center. Thus, the *Beck* court concluded that the plaintiffs' complaint alleged a

---

5. The Court has no information regarding the number of females in the Bradford marching band at that time.

6. *Compare Wright v. City of Ozark*, 715 F.2d 1513 (11th Cir.1983), in which a woman raped by an unknown assailant brought a § 1983 action against the city, the mayor, the police chief and a member of the police department alleging that the defendants had deliberately suppressed information of prior rapes in a certain area of the city to avoid adverse publicity. The Eleventh Circuit found there to be no "special relationship" because the defendants had not intentionally singled her out to be denied protection from a rapist and there was no allegation that the defendants knew of the plaintiff before the rape occurred.

"special relationship" between the Kansas Adult Authority and the plaintiffs.

In the present case, the question is whether the defendants were in a "special relationship" with the endangered "identifiable group," female students (or band members) at the Bradford high school. We find that the defendants owed a duty to protect its students from sexual abuse by its teachers. We think this duty is at least as clear as those owed to the tenants in *P.L.C.*, the abused women in *Thurman*, or the visitors to the medical center in *Beck*. The people and the legislature of Pennsylvania trust their children to the care and supervision of school officials, and grant those officials in loco parentis authority over those children while they attend school.[7] In addition, school districts are statutorily authorized to fire teachers for "immorality," which has been held to include uninvited advances by teachers toward students. 24 P.S. § 11–1122; *see Keating v. Bd. of School Directors of Riverside School District*, 99 Pa.Cmwlth. 337, 513 A.2d 547 (1986), *app. denied*, 514 Pa. 626, 522 A.2d 51 (1987). As we stated in *Stoneking v. Bradford Area School District*, "abuse of this type is not tolerated when the victim is a prison inmate or a patient in a state hospital. Clearly then, the constitution must offer school children similar protections." 667 F.Supp. 1088, 1095 (W.D.Pa.1987) [citations omitted]. We find that a "special relationship," with an accompanying duty to protect, exists between a student and her school district, school district superintendent, principal and vice principal.

The defendants raise the factual distinction that this assault took place off school grounds at the teacher's home, at the beginning of summer vacation. The defendants argue that "in no sense of the word could any 'special relationship' exist at the time of this alleged assault." Defendants' Brief in Support, p. 17 n. 7. Under the facts of this case, we do not agree. The increased threat to female students created by the defendants' alleged tolerance for sexual abuse was not the sort of danger that disappeared when those students packed up their instruments and walked out of the band room. Because Wright conducted marching band practices during the summer months, his opportunity to abuse his female band students, opportunity he possessed by virtue of his position as a teacher and director of the band, did not disappear when the school bell sounded the end of day or the beginning of vacationtime. Presumably it would have made little difference if the maintenance man in *P.L.C. v. Housing Authority of the County of Warren* had been off-duty, or on vacation, when he used his housing authority key to enter the rape victim's apartment. Similarly, it is irrelevant to this Court in determining the existence of a "special relationship," whether Sowers was assaulted while she was picking up a marching band tape for band practice to be held during the school year or during the summer months. The timing and circumstances of the assault may or may not be relevant to the factual determination of causation of Sowers' injury, but, as we will discuss later in this decision, the question of proximate cause requires factual development and is therefore inappropriate to decide on a motion to dismiss.

### D. Requirements for Liability Under § 1983 For A Failure To Act

■ The defendants are alleged to have fostered a practice, custom and/or policy of reckless indifference and/or active concealment of instances of known or suspected sexual abuse. The complaint alleges that this practice, custom and/or policy was the result of both overt activity and failures to act on the part of the defendants. Government officials may be held liable under § 1983 for a failure to do what is required

---

7. The Pennsylvania Public School Code states that:

Every teacher, vice principal and principal in the public schools shall have the right to exercise the same authority as to conduct and behavior over the pupils attending his school, during the time they are in attendance, including the time required in going to and from their homes, as the parents, guardians or persons in parental relation to such pupils may exercise over them.

24 P.S. § 13–1317 (1988 P.P.).

as well as for overt activity which is unlawful and harmful. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Doe v. New York City Dept. of Social Services,* 649 F.2d 134, 141 (2d Cir. 1981) [Doe I]; *Duchesne v. Sugarman,* 566 F.2d 817, 822 (2d Cir.1977) ("where conduct of the supervisory authority is directly related to a denial of a constitutional right, it is not to be distinguished as a matter of causation, upon whether it was action or inaction"). For a § 1983 cause of action to arise where an official is charged with failing to exercise an affirmative duty, the failure to act must have been a substantial factor leading to the violation of a *constitutionally protected liberty or property interest. Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). The official having the responsibility to act must also have displayed *"deliberate indifference"* or *"gross negligence." Turpin v. Mailet,* 619 F.2d 196 (2d Cir.), *cert. denied sub nom. Turpin v. West Haven,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980) ("deliberate indifference" standard); *Doe v. New York City Dept. of Social Services,* 709 F.2d 782, 789–790 (2d Cir.1983) [Doe II], *cert. denied sub nom. Catholic Home Bureau v. Doe,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983) ("gross negligence" standard) (*citing Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed. 2d 28 (1982)). As our reasoning below will explain, we believe that these two requirements, an alleged violation of a protected liberty interest and an alleged display of "deliberate indifference" or "gross negligence," are met in the plaintiff's complaint.

1. *Violation of a Liberty Interest: Substantive Due Process*

■ The first of the two requirements for a § 1983 claim for a failure to act is that the failure to act must have been a substantial factor leading to the violation of a constitutionally protected liberty or property interest. As to whether the plaintiff has alleged that the defendants' failures to act amounted to a *substantial factor* leading to the constitutional violation, we believe the complaint does so allege. Furthermore, as we will explain later

in the statute of limitations section of this opinion, the question of causation is not amenable to determination on the basis of pleadings alone. We will therefore move on to the question of whether the plaintiff has properly alleged a constitutionally protected liberty interest.

The liberty interest which the plaintiff alleges was deprived her was a substantive due process right to be free from sexual abuse. Substantive due process rights are significantly different from procedural due process rights. Procedural due process involves expectations created by state law. As to these rights, the state may take them away by affording pre-deprivation hearings, post-deprivation hearings or other safeguards. Substantive due process, on the other hand, is concerned with rights such as those listed in the Bill of Rights and those rights held to be so fundamental that a state may not take them away regardless of the fairness of the procedures used to do so. *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 663, 88 L.Ed.2d 662, 668 (1986). Justice Frankfurter noted that the scope of due process protection is not subject to precise definition:

> Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are so rooted in the traditions and conscience of our people as to be ranked as fundamental, *Snyder v. Massachusetts,* 291 U.S. 97, 105 [54 S.Ct. 330, 332, 78 L.Ed.2d 674 (1934) ], or are implicit in the concept of ordered liberty. *Palko v. Connecticut,* 302 U.S. 319, 325 [58 S.Ct. 149, 152, 82 L.Ed.2d 288 (1937) ].

*Rochin v. California,* 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed.2d 183 (1952). Due process "is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints." *Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). "The content of substantive due process must be determined in each case through disinterested inquiry and by judgment not *ad hoc* and episodic but duly mindful of

reconciling the needs of both continuity and of change in a progressive society." *Doe "A" v. Special School District of St. Louis County,* 637 F.Supp. 1138, 1144 (E.D.Mo. 1986) *(citing Rochin v. California,* 342 U.S. at 172, 72 S.Ct. at 209.)

Courts have recognized that substantive due process includes the right to be free from state intrusions into personal privacy and bodily security.[8] Illustrative of the substantive due process rights of students is a recent Missouri case, *Doe "A" v. Special School District of St. Louis Co.,* 637 F.Supp. 1138 (E.D.Mo.1986). That action concerned nine handicapped children who had repeatedly been beaten and sexually abused over the course of a year and a half by a school bus driver while they were passengers aboard his bus. Claims were brought under § 1983 against the bus driver, the school district and twelve individual school administrators. *Id.* at 1141. Despite receiving complaints from parents, teachers and other school employees, it was alleged that the school district and school administrators: (1) failed to investigate the complaints; (2) concealed the bus driver's actions by discouraging investigation; (3) failed to develop a policy to provide training for the investigation of complaints and to screen employees for their propensity to abuse children; (4) failed to report the bus driver's conduct to law enforcement and child protective agencies despite their statutory obligations to do so. *Id.* at 1142.

When the defendants in *Doe "A"* moved to dismiss the § 1983 claims for failure to allege conduct arising under color of state law and failure to allege actions which rise to the level of constitutional violations, the district court denied the motions. The court first found that the bus driver, as a school district employee, acted under color of state law. *Id.* at 1143. After examining the legal development of substantive due process rights, the court stated that "this Court does not doubt that the constitutional rights of children to be free from harm is commensurate with the rights of adults in state custody." *Id.* at 1145. The court concluded that:

> The acts of abuse alleged by plaintiffs state a substantive due process claim. The acts intrude upon the personal privacy and bodily integrity of these children. The acts intrude in ways more personal and private than a jailhouse beating and in ways which will surely leave psychological scars long after physical healing is complete.... The alleged acts of [the bus driver] and the alleged tolerance of these acts by [the school district] and the individual defendants pass beyond the pale of common law torts. They shock the conscience of this Court.

*Doe "A",* 637 F.Supp. at 1145.

In *Hall v. Tawney,* a case involving the infliction of severe corporal punishment on grade school students, the Fourth Circuit explained the substantive due process right at issue as:

> the right to be free of state intrusions into the realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to

---

**8.** *See, e.g., Ingraham v. Wright,* 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711, 731–732 (1977) (corporal punishment of students by teachers, substantive due process right to personal security); *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (forcible use of stomach pump by police); *Taylor By And Through Walker v. Ledbetter,* 818 F.2d 791 (11th Cir.1987) (foster child suit against state and county officials for injuries received in custody of foster parents); *Davis v. Forrest,* 768 F.2d 257, 258 (8th Cir.1985) (two police officers' unnecessary beating plaintiff with flashlights); *Doe v. New York City Dept. of Social Services,* 649 F.2d 134, 141–145 (2d Cir.1981) (municipality liable under § 1983 for deliberate indifference to sexual abuse of foster child by foster parent); *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980) (severe corporal punishment inflicted upon grade school student by teacher violated student's substantive due process rights); *White v. Rochford,* 592 F.2d 381 (7th Cir.1979) (police arrest driver of car, abandoning three passenger children); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) (unprovoked beating of pretrial detainee by guards); *Jenkins v. Averett,* 424 F.2d 1228, 1231–32 (4th Cir.1970) (reckless pistol shooting of suspect by police); *Doe "A" v. Special School District of St. Louis County,* 637 F.Supp. 1138 (E.D.Mo.1986) (handicapped children beaten and sexually abused by school bus driver); *Thurman v. City of Torrington,* 595 F.Supp. 1521 (D.Conn.1984) (police with notice of possibility of attacks on women in domestic relationships).

shock the conscience of a court. The existence of this right to ultimate bodily security—the most fundamental aspect of personal privacy—is unmistakably established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process. Numerous cases in a variety of contexts recognize it as a last line of defense against those literally outrageous abuses of official power whose very variety makes formulation of a more precise standard impossible.

*Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980) (citations omitted). The court explained that it "simply do not see how" it could fail to uphold the right in "public school children under the disciplinary control of public school teachers" when the right was upheld in persons charged with or suspected of crime and in the custody of police officers. *Id.*

We think it apparent that the plaintiff's complaint alleges a deprivation of Sowers' right to be free from state intrusions, in this case by her teacher, into her personal privacy and bodily security. Because such a right is embraced within the scope of substantive due process, this satisfies the requirement that her complaint allege a violation of a constitutionally protected liberty interest.

### 2. "Deliberate Indifference" or "Gross Negligence" by Defendants

■ The second requirement for a § 1983 claim for a failure to act is that the official having the responsibility to act must display "deliberate indifference" or "gross negligence." The question is whether this requirement is met by the plaintiff's allegation of "reckless indifference" by the defendants. Traditionally the term "gross negligence" has been held equivalent to the words "reckless and wanton," *see, e.g., Jones v. Commonwealth*, 213 Ky. 356, 281 S.W. 164, 167 (1926), and the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251

(1976), has characterized deliberate indifference as "the wanton infliction of unnecessary pain." 429 U.S. at 105, 97 S.Ct. at 291. Furthermore, in *Estate of Bailey by Oare*, the Third Circuit described the burden of proof on the plaintiffs in that § 1983 action as "[permitting] the fact finder to infer deliberate or *reckless indifference* or unconcern or callous disregard for" the deceased plaintiff's safety. *Estate of Bailey by Oare*, 768 F.2d 503, 508 (3d Cir.1985) [emphasis added]; *see also Commonwealth Bank & Trust Co., N.A. v. Russell*, 825 F.2d 12, 17 (3d Cir.1987). We therefore conclude that the plaintiff's allegation of "reckless indifference" properly states a claim against the defendants under § 1983.

Because the plaintiff's complaint properly alleges a claim under § 1983, we will deny the defendants' motion to dismiss the complaint for failure to state a claim.

### III. *Statute of Limitations and Discovery Rule for Tolling*

In *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), the Supreme Court ruled that the statute of limitations for § 1983 actions is the statute of limitations for the relevant state's personal injury statute. Since this § 1983 action arose within the Commonwealth, we must apply the two-year statute of limitations set forth in 42 Pa.C.S.A. § 5524(2). *See Sullivan v. City of Pittsburgh Pa.*, 811 F.2d 171 (3d Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); *Stoneking v. Bradford Area School District*, 667 F.Supp. 1088, 1091 (W.D.Pa. 1987).

■ Federal courts have recognized a "discovery rule" for setting the date from which the two-year statute of limitation would begin to run. Courts distinguish between the date when a cause of action accrues and the tolling of a statute of limitations.[9] State law governs the tolling of the statute, unless state law is inconsist-

---

9. A cause of action "accrues" when a suit may be maintained thereon, whenever one person may sue another. Black's Law Dictionary (rev. 4th ed., 1968) p. 37. The tolling of a statute of limitations essentially "stops the clock" with re-

gard to the limitation. This includes the delay of the initial running of the limitations period, interruption of the running of the limitations period, or timely filing of the action within the statutory limitations period.

ent with the purposes behind the civil rights acts. *Board of Regents v. Tomanio*, 446 U.S. 478, 484–86, 100 S.Ct. 1790, 1795–96, 64 L.Ed.2d 440 (1980) (§ 1983 claim).[10] The accrual of a civil rights action, however, is a question of federal law. *Dreary v. Three Un-named Police Officers*, 746 F.2d 185, 197 n. 16 (3d Cir.1984); *Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir.1982) (per curium) (*citing Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir.1975)); *Plain v. Flicker*, 645 F.Supp. 898, 901 (D.N.J.1986) (claims under 42 U.S.C. §§ 1983, 1985). We consider the accrual of the cause of action to be the threshold statute of limitations issue because any state tolling doctrine would not come into play until the cause of action had accrued. Under federal law, a § 1983 claim accrues when the plaintiff knows or has reason to know of the injury that constitutes the basis of her action. *Id.* Federal courts have fashioned a "discovery rule" which requires that a cause of action accrues when the plaintiff becomes aware, or should have become aware, of both the fact of injury and its causal connection to the defendant, although the plaintiff need not know that the defendant's conduct is tortious or unlawful.[11] *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (discovery rule under Federal Tort Claims Act); *see also Plain v. Flicker*, 645 F.Supp. 898, 901 (D.N.J.1986)

(applying *Kubrick* rule to § 1983 action); *Hauptmann v. Wilentz*, 570 F.Supp. 351, 396 (D.N.J.1983), *aff'd* 770 F.2d 1070 (3d Cir.), *cert. denied* 474 U.S. 1103, 106 S.Ct. 807, 88 L.Ed.2d 922 (1986) (also applying *Kubrick* rule to § 1983 claim).[12]

The *Kubrick* rule's distinction between a plaintiff's knowledge of her injury and knowledge of the defendant's causal connection to the injury is illustrated by the Fifth Circuit's decision in *Lavellee v. Listi*, 611 F.2d 1129 (5th Cir.1980). In *Lavellee*, the plaintiff alleged that on September 8, 1976 he had been arrested and then transported to a hospital where he was forced by several defendant deputy sheriffs to undergo an extraction of his spinal fluid, a procedure performed by defendant medical personnel. He was then locked in a bare, unsanitary, padded cell where his pleas for an examination for the pain in his back were first met with threats of beatings, after which he was placed in irons and locked, hands and feet, to a drain pipe, in a fetal position. *Id.* at 1130. The plaintiff alleged that he was not allowed to see a physician until February 3, 1977, nearly five months later, at which time he first discovered that his back had been permanently injured. The plaintiff filed his action for medical malpractice and civil rights (under § 1983) on January 10, 1978. Noting the one year limitations period bor-

**10.** *See also Wilson v. Garcia*, 471 U.S. 261, 269 & n. 17, 105 S.Ct. 1938, 1943 & n. 17, 85 L.Ed.2d 254, 262 & n. 17 (1985); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

**11.** As this Court noted in *Stoneking v. Bradford Area School District*, 667 F.Supp. 1088 (W.D.Pa. 1987), Pennsylvania courts have also recognized a "discovery rule" exception to its statute of limitations. *Id.* at 1092 & n. 5. *See Lewey v. H.C. Frick Coke Co.*, 166 Pa. 536, 547, 31 A. 261, 263 (1895); *Bowser v. Guttendorf*, —— Pa.Super. ——, 541 A.2d 377, 380 (1988); *Anthony v. Koppers Co.*, 284 Pa.Super. 81, 425 A.2d 428 (1980), *rev'd on other grds.*, 496 Pa. 119, 436 A.2d 181 (1981) ("as the rule has developed it has become clear that its basis is not concealment by the defendant but rather the ability of the plaintiff to discover ... [her] injury or its cause." *Id.* at 95, 425 A.2d at 436); *see also Burnside v. Abbott Laboratories*, 351 Pa.Super. 264, 292, 505 A.2d 973, 988 (1985) ("[W]here the issue involves a

factual determination regarding what is a reasonable period of time for a plaintiff to discover ... [her] injury and its cause the determination is for the jury.").

**12.** While it is not necessary as yet for us to decide whether the defendants actively concealed their alleged unlawful conduct, as the complaint alleges, active concealment by a defendant tolls the running of the statute until a plaintiff discovers the cause of action or discovers facts that reasonably put her on notice of it. *See Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed.2d 743 (1946) (the equitable tolling doctrine "is read into every federal statute of limitations."); *Plain v. Flicker*, 645 F.Supp. at 902 (§ 1983 claim); *Cohen v. McAllister*, 673 F.Supp. 733, 739–740 (W.D.Pa. 1987). *See also Redenz by Redenz v. Rosenberg*, 360 Pa.Super. 430, 520 A.2d 883 (1987) (if tortfeasor actively conceals, statute of limitation tolled until injured person can overcome concealment).

rowed from Louisiana law, the district court dismissed the plaintiff's civil rights and medical malpractice claims for the incidents occurring prior to January 10, 1977. The Fifth Circuit reversed and remanded the dismissal of the malpractice claim, arguing that:

> If the plaintiff was unaware of the permanence of his injury, and reasonably thought that the pains in his back were the normal result of a spinal tap or were caused by the alleged assaults, he cannot be deemed to have knowledge of the factual predicate of his claim or its connection with possible malpractice by the defendants. Until he suspected, or should have suspected, that his pain was not the result of a properly-conducted spinal tap or of the alleged assaults, he lacked any factual basis on which to suspect an invasion of his legal rights.

*Lavellee v. Listi,* 611 F.2d at 1131–1132.

In *Lavellee,* as with the present case, there is a crucial, if subtle, distinction between the plaintiffs' knowledge of his or her injury and knowledge of the causal connection between the injury and a particular defendant's actions. The plaintiff in *Lavellee* certainly knew or should have known soon after his involuntary spinal tap and shackling that somehow he had been injured at the hands of the deputy sheriffs, just as the plaintiff in the case at bar knew that she had been sexually assaulted and injured by Mr. Wright. Nonetheless, the Fifth Circuit found that the plaintiff in *Lavellee* could not necessarily be expected to know that his permanent back injury was also proximately caused by an improperly conducted spinal tap operation by the defendant medical personnel. Likewise, the critical question this Court now faces is whether Sowers knew or should have known that the school district, superintendent, principal and assistant principal had fostered an environment of deliberate indifference toward teacher abuse of female students which was a proximate cause of her injury.

■ The defendants argue that this action should be barred by the statute of limitations because: (1) defendants did not have a policy or custom of reckless indifference; (2) their conduct was not a cause of the plaintiff's injury; and (3) even if their conduct was found to be a cause of her injury, the plaintiff knew or should have known of that causal connection in late 1979 or early 1980, when school administrators pressured her to renounce her charges and publicly apologize to Wright.

The defendants direct this Court's attention to the Third Circuit's decision in *Sandutch v. Muroski,* 684 F.2d 252 (3d Cir. 1982), to recast the federal discovery rule for accrual of a cause of action as follows:

> that notice of improper conduct by government officials should lead a plaintiff, by the exercise of due diligence, to the awareness that he has a cause of action against the government officials based upon a conspiracy to violate his civil rights.

Defendants' Brief in Support, p. 7. This is an inaccurate statement of the holding of *Sandutch,*[13] as well as of the actual federal

---

13. *Sandutch* was a civil rights action against state prosecutors alleging a violation and conspiracy to violate the plaintiff's constitutional rights by obtaining a false confession from an alleged co-conspirator and using it to prosecute the plaintiff, Sandutch, for arson and murder. 684 F.2d 252. The false testimony linking Sandutch to the crime was given during a preliminary hearing and was introduced at his criminal trial. After the preliminary hearing but prior to trial the alleged co-conspirator recanted, saying his statements were made under duress. Sandutch's attorney attempted to introduce the taped recantation at the criminal trial, but the court excluded it. Several years later in September, 1980 (after Sandutch had been convicted and jailed) Sandutch obtained an affidavit from the alleged co-conspirator explaining the circumstances under which the false statement was obtained. Sandutch filed his civil rights action two weeks later, arguing that he neither knew nor had reason to know of his injury until he received the September, 1980 affidavit.

The Third Circuit found that Sandutch should have known of the alleged conspiracy because: although at that time Sandutch may not have known all the facts necessary to establish that the defendants conspired to deprive him of his right, his 1976 knowledge of the alleged falsity of [the alleged co-conspirator's] statement obtained under duress should have led, by the exercise of due diligence, to the awareness that he had a cause of action. The statute began to run then.

discovery rule. While the actual discovery rule delays accrual of a cause of action until a plaintiff knew or should have known of the injury and its causal connection to the defendant, the defendants' misstatement of the rule would have the cause of action accrue when the plaintiff receives "notice of improper conduct by government officials." *Id.* Defendants use this inaccurate statement of the rule to argue that Sowers' cause of action accrued at the time of her September, 1979 meeting with Smith and Miller at which she alleges the defendants engaged in "improper conduct," by attempting to intimidate, threaten and coerce her into retracting her allegations against Wright. *Id.* at 9. The defendants assert that "[s]urely the alleged overt and hostile conduct of Defendants at this meeting was sufficient, as a matter of law, to put [Sowers] on notice of the conspiracy." *Id.* However, the defendants' treatment of Sowers after the assault was not, and obviously could not have been, a cause of her assault. There is no allegation that Sowers knew of the defendants' handling of previous sex abuse complaints against teachers. Furthermore, there are many credible explanations for why observance of the defendants' conduct at the 1979 meetings might not be expected to lead her to the conclusion that there was a policy of reckless indifference (e.g., Sowers thought that the defendants simply did not believe her allegations). Merely because the plaintiff had witnessed some "improper conduct" by the defendants did not necessarily give her reason to know of an ongoing policy of reckless indifference to numerous complaints of sexual abuse by teachers which might have been a proximate cause of her own injury.

In order for this Court to decide the statute of limitations question, we must consider the allegations of the plaintiff's complaint with relation to the "knew or should have known" standard. As to the question of whether the plaintiff actually knew of her injury and the causal connection between her injury and the defendants' conduct, the plaintiff insists that it was not until Edward Wright's history of sexual abuse was revealed to the Bradford community in March, 1986 that she knew of the defendants alleged reckless indifference toward the problem. Bearing in mind our responsibility to construe the facts in the light most favorable to the plaintiff when ruling on a motion to dismiss, we must conclude for the purpose of this motion that it was not until March, 1986 that Sowers actually knew how the defendants' conduct had proximately caused her injury.

The more difficult question is whether or not Sowers *should have known* of the causes of her injury. The Third Circuit has stated that "[w]hether or when a plaintiff knows or has reason to know of the existence and cause of his or her injury will often turn on inferences drawn from disputed facts." *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 487 (3d Cir.1985) (affirming jury finding that plaintiff knew or had reason to know of cause of asbestos-related condition more than two years prior to lawsuit). We find it significant that the plaintiff's complaint alleges more than one incident of abuse of female students by teachers prior to Wright's June, 1979 assault upon the plaintiff, with school officials taking only minimal disciplinary action in response.[14] We are not sure that these alleged prior incidents will prove a formal policy or custom, but as the Third Circuit stated in *Estate of Bailey By Oare v. County of York*, 768 F.2d 503 (3d Cir. 1985), "even in the absence of formal agency conduct, an 'official policy' may be inferred 'from informal acts or omissions of supervisory municipal officials'.... '[t]he issue of authorization, approval or encour-

---

684 F.2d at 254. Nowhere in the *Sandutch* decision do we find any reference to the "notice of improper conduct" discovery rule represented to this Court by the defendants.

**14.** We view the plaintiff's allegations concerning the defendants' handling of sexual abuse incidents prior to the Sowers episode as relevant evidence of policy or custom of deliberate indif-

ference toward such behavior by teachers. This does not mean that this Court has decided that evidence of subsequent acts may not also tend to prove the nature of a prior conspiracy. *See, e.g., Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 171 (5th Cir.), *cert. denied* —— U.S. ——, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987).

agement is generally one of fact, not law.' " *Id.* at 506 (citations omitted) (*quoting Turpin v. Mailet,* 619 F.2d 196, 200, 201 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); *see also Owen v. City of Independence,* 445 U.S. 622, 633–34 & n. 13, 655 n. 39, 100 S.Ct. 1398, 1406–07 & n. 13, 1417 n. 39, 63 L.Ed.2d 673 (1980). We believe that the plaintiff is entitled to offer evidence to support her claim that she did not know, and should not have been expected to know, that there existed an environment of reckless indifference toward sexual abuse of female students by teachers at the Bradford Area School District.

We think the plaintiff is also entitled to an opportunity to engage in discovery and attempt to prove that the alleged practice, custom and/or policy of reckless indifference to students' complaints of sexual abuse of female students by male teachers was a proximate cause of her injury. The Third Circuit has stated that "[o]rdinarily, proximate cause cannot be determined on the basis of pleadings but instead requires a factual development at trial." *Estate of Bailey by Oare v. County of York,* 768 F.2d at 511 (*citing Black v. Stephens,* 662 F.2d 181, 190–91 (3d Cir.1981), *cert. denied,* 445 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982) (jury question whether policy at issue proximately caused injury)). "Whether there is an 'affirmative link' between 'the adoption of any plan or policy ... express or otherwise' and the injury complained of is ordinarily an issue that requires a factual development." *Id.* at 511 (*quoting Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561, 569 (1976)).

We think factual development will be necessary to make a determination as to whether the defendants alleged conduct was a proximate cause of the plaintiff's injury, and if the plaintiff knew or should have known of that alleged causal connection between the defendants' conduct and the sexual assault upon Sowers. We will therefore deny the defendants' motion to dismiss the action as barred by the statute of limitations.

## IV. *Qualified Immunity*

 The individual defendants Smith, Miller and Shuey also seek dismissal on the basis that their actions were within the scope of those actions protected by the doctrine of qualified immunity.[15] Qualified or "good faith" immunity is an affirmative defense that recognizes that government officials are entitled to some form of immunity from suits for damages. The Supreme Court, in *Harlow v. Fitzgerald,* held that:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of a person of which a reasonable person would have known.

457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). The individual defendants' eligibility for dismissal of this action under the qualified immunity doctrine turns on whether a reasonable person would have known that their conduct violated a clearly established constitutional right.

These same defendants previously have raised the qualified immunity defense before this Court as a basis for granting them summary judgment in *Stoneking v. Bradford Area School Dist.,* another suit brought by a female student at the Bradford high school raising constitutional claims stemming from sexual abuse suffered at the hands of Edward Wright.[16]

---

**15.** The defendants do not assert the qualified immunity defense on behalf of the school district, conceding that the doctrine does not apply to a municipal defendant. Defendants' Brief in Support, p. 19 n. 11 (*citing Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)).

**16.** Wright's sexual abuse and harassment of Kathleen Stoneking began in the fall of 1980.

The first incident of abuse consisted of Wright forcibly kissing her, and as time progressed the abuse greatly accelerated both in terms of frequency and intrusiveness. The assaults continued on an almost weekly basis until Stoneking's graduation in the spring of 1983. *See Stoneking v. Bradford Area School Dist.,* 667 F.Supp. 1088, 1090–1091 (W.D.Pa.1987).

This Court held that the defendants were not entitled to qualified immunity, concluding that a reasonable person would have been aware that the plaintiff had a substantive due process right to be free from intrusions into her "personal privacy and bodily integrity." *Stoneking*, 667 F.Supp. 1088, 1102 (W.D.Pa.1987). We stand by that conclusion, and deny the individual defendants' motion to dismiss on the basis of qualified immunity.